# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 40337**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Michael B. KIGHT**
Senior Airman (E-4), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 14 March 2024

————————————

*Military Judge*: Dayle P. Percle.

*Sentence*: Sentence adjudged on 29 April 2022 by GCM convened at Sheppard Air Force Base, Texas. Sentence entered by military judge on 20 June 2022: Dishonorable discharge, confinement for 66 months, reduction to E-1, and a reprimand.

*For Appellant*: Major Samantha P. Golseth, USAF; Scott R. Hockenberry, Esquire; Brad W. Simon, Esquire.

*For Appellee*: Lieutenant Colonel J. Pete Ferrell, USAF; Major Olivia B. Hoff, USAF; Major Jocelyn Q. Wright, USAF; Mary Ellen Payne, Esquire.

Before ANNEXSTAD, GRUEN, and KEARLEY, *Appellate Military Judges*.

Senior Judge ANNEXSTAD delivered the opinion of the court, in which Judge GRUEN and Judge KEARLEY joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

ANNEXSTAD, Senior Judge:

Appellant was tried by a general court-martial at Sheppard Air Force Base (AFB), Texas. Contrary to his pleas, a panel of officer and enlisted members found Appellant guilty of two specifications of sexual assault, in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920.[1,2] The military judge sentenced Appellant to a dishonorable discharge, confinement for 66 months, reduction to the grade of E-1, and a reprimand. The convening authority deferred the automatic forfeitures until entry of judgment and waived the automatic forfeitures for the benefit of Appellant's dependent child.

On 27 December 2023, Appellant raised four issues which we have reworded and reordered into five issues: whether (1) Appellant's convictions for sexual assault are legally and factually sufficient; (2) the military judge erred in allowing the Government to admit improper evidence; (3) trial counsel committed prosecutorial misconduct during argument; (4) Appellant was denied effective assistance of counsel; and (5) Appellant was denied his right to a unanimous verdict.

With respect to issue (5), we have carefully considered Appellant's contentions and find they do not require further discussion or warrant relief. *See United States v. Anderson*, 83 M.J. 291, 302 (C.A.A.F. 2023), *cert. denied*, No. 23-437, 601 U.S. __ (20 Feb. 2024); *United States v. Guinn,* 81 M.J. 195, 204 (C.A.A.F. 2021) (citing *United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987)).

Finding no error that materially prejudiced a substantial right of Appellant, we affirm the findings and sentence.

## I. BACKGROUND

In early 2018, Appellant met CT while they were both attending technical school. Shortly thereafter, the two began dating and later were engaged, while still in training and while Appellant was still married. CT believed Appellant was separated from his spouse and was going through the divorce process. In the fall of 2018, Appellant and CT graduated from technical school. Subsequently, Appellant received orders to Sheppard AFB, Texas, while CT received

---

[1] All references to the UCMJ, Rules for Courts-Martial (R.C.M.), and Military Rules of Evidence (Mil. R. Evid.) are to the *Manual for Courts-Martial*, *United States* (2019 ed.).

[2] The members also found Appellant not guilty of one specification of sexual assault (Specification 3 of Charge I) and one specification of assault (Specification 2 of Charge II) in violation of Articles 120 and 128, UCMJ. 10 U.S.C. §§ 920, 928.

orders to Barksdale AFB, Louisiana. Both were excited at the relative proximity of their assignments to one another, and frequently saw each other on weekends and holidays, until the summer of 2019.

In the summer of 2019, CT ended the relationship with Appellant because she found out Appellant was still married, and he was pursuing a relationship with another woman near Sheppard AFB. However, the two continued to talk with one another, and had discussed the possibility of restarting their relationship at some point. Eventually, Appellant and CT stopped talking and both began dating other people. In December 2019, Appellant began pursuing a relationship with CT again.

## A. CT's Testimony

At trial, CT described Appellant as "desperate to reenter" into a relationship with her. Appellant came to visit CT at Barksdale AFB in June of 2020 in an attempt to be a supportive friend following the end of CT's relationship with another man. While CT was not sure of the exact day, she was certain it was in June and before the Fourth of July weekend. During this visit, CT and Appellant spent the day fishing and kayaking, and later returned to her dormitory room to relax and watch television. While in the dormitory room, CT was sitting on her bed and Appellant was sitting on a chair at her desk. At some point, CT noticed Appellant's "demeanor kind of changed" and "he seemed very forward." As he approached CT, Appellant told her that "he had come out all this way to help [her] and that this was the least [she] could do for him." CT understood Appellant's statement to mean that Appellant wanted to have sex with her. Next, Appellant got into CT's bed, climbed on top of her, and "caged" her in with his legs. CT told Appellant, "No," and that she "wasn't ready, that [she] didn't want to" have sex with him. She also attempted to push him off her, but despite her efforts, Appellant proceeded to remove her clothing. Appellant then grabbed a condom from his wallet and penetrated her while she was protesting by trying to push him off and crying. CT described the experience as painful, specifically saying, "[I] hurt where [Appellant] penetrated me."

CT described a second incident where Appellant sexually assaulted her. Although she could not remember an exact date, she did recall that it was before the Fourth of July weekend and approximately two weeks after the first assault that occurred in June. This incident was very similar to the first assault described above. She and Appellant went fishing and kayaking and later returned to her dormitory room. While there, Appellant approached CT as she was lying on her bed, climbed on top of her, caged her in with his legs, and removed her pants. CT told Appellant "no" and she "didn't want this." CT also described that Appellant again grabbed a condom from his wallet and proceeded to penetrate her vagina with his penis as she was crying. On this occasion, CT specifically remembered Appellant telling her to "stop crying" and he

"ended up putting a pillow over [her] face." After Appellant ejaculated, he told CT it was not enjoyable "[b]ecause [she] was crying the whole time."

The following exchange occurred between trial counsel and CT:

Q: When he got on top of you in the bed in your dorm room and inserted himself into you after you told him no and you weren't ready, did any part of you consent to that?

A: No.

Q: When he did it again two weeks later and put a pillow over your head as you cried, was that consensual?

A: No.

CT explained she did not immediately report either of the sexual assaults and did not see Appellant again in person after the second assault. The two continued to talk infrequently on the telephone until August 2020 when CT confronted Appellant about the assaults. The conversation ended in an argument culminating in CT blocking Appellant's ability to contact her via her iPhone.

## B. Message Exchange

CT had no contact with Appellant until December 2020 when he reached out to her via a messaging application which allowed text messages to go through because it "gave him like an alternate number." In one of the text messages Appellant apologized to CT for his actions, stating, "I'm sorry for everything I did, the emotional and mental torture I put you through. I have a lot to say, but I don't wanna waste a lot of your time. I've done enough of that already." Appellant continued:

I've done a lot of bad things to you. Manipulation, using you for things, cheating, leaving you in a time of need. Not truly seeing you for your actual worth. This is just to name a few. I manipulated you and made you feel like you were crazy. Not truly caring about you. Being selfish and not understanding the true meaning of love. Forcing my insecurities onto you. Making you feel insignificant.

CT was unconvinced Appellant appreciated what he had done to her, and responded to his message with, "[Y]ou forced me to have sex with you. [Y]ou even hurt me physically on multiple occasions and played it off as us just rough[-]housing or having fun." Appellant immediately called CT in response to her message, but she refused to take his call. Appellant continued to call CT and texted her stating, "[I want t]o do what I should have done a long time ago[.] I want to admit to things over the phone if you can just pick up and

4

listen. You don't have to speak." CT refused to take his phone call and texted, "[I]f you[']re truly sorry[,] then apologize," to which Appellant responded, "You won't report me?" CT asked Appellant to type out why he was sorry, and Appellant texted the following:

> I used to push you and yell at you. I used you sexually. I can't take back the things [I]'ve done, but [I]'m changing myself for the future. I'm sorry, and I wish I could take back all the things [I]'ve done, but I can't. I can't change them.

The collection of text messages detailed above was admitted as a prosecution exhibit.

CT did not respond to Appellant's message and had no contact with him until February 2021 when he reached out to her again using a different phone number. This text string was also admitted as a prosecution exhibit and showed CT stating, "[D]ude, you raped me[,] and [I']ve blocked you[,] and you have a wife." Appellant responded, "Okay[.] I won't contact you ever again."

## C. Pretext Conversations

In March of 2021, security forces began investigating a domestic dispute between Appellant and his wife. After learning that Appellant may have sexually assaulted CT, the investigation was passed to the Air Force Office of Special Investigations (AFOSI). Special Agent (SA) RF was the lead agent on Appellant's case. SA RF testified at trial that after he contacted CT and gathered details regarding the sexual assaults that took place in the summer of 2020, he asked CT to initiate a "pretext" phone call with Appellant. She did. SA RF explained three pretext conversations took place but nothing significant came of the first two pretext exchanges. However, the third pretext conversation, which took place over FaceTime on 22 April 2021, did have evidentiary value— as explained further below.[3] The video recording of the hour-long conversation on 22 April 2021 was admitted as a prosecution exhibit and was played for the panel members during trial.

During this conversation, CT expressed a desire to rekindle her relationship with Appellant and asked him to acknowledge what he had done to her. In response, Appellant stated he knew "what [he] did was wrong" and was "sorry for [ ] taking advantage of [her] sexually whenever [she] w[as] in a moment of f[**]king crisis and [she] w[as] crying, and then [he] just kind of left [her] there after everything was done." Appellant also stated he was sorry for trying to "control" CT. Later Appellant described himself as a "monster" and explained it was "wrong" that he had "used [her] for sex." Appellant asked CT

---

[3] FaceTime is an application for real-time video and voice calls over the Internet.

what she wanted from him saying, "Like I can't take back like the things that happened. I really can't." CT continued to press Appellant to describe why he was sorry and, in response, Appellant stated,

> I hit you. Like I took your clothes off. Like I tried to take back my shirt proportionally. Like you told me to stop. Like to not take your shirt off. Like I was like laying [sic] in bed and I got on to [sic] you, and you told me to stop. All these things like you told me to stop and told me not to do. And you may not feel like it is genuine.
>
> . . . .
>
> I'm sorry for hitting you. I'm sorry for pushing you. I'm sorry for taking off your shirt after you said stop. I'm sorry for f[**]king making you cry, for like trying to have sex with you when you didn't want to have sex, for having sex with you. Like I'm sorry for all those things, but I can't make them go away. They're there, and they will always be there at least for you. And I f[**]king hate myself for it, [CT].

Towards the end of the FaceTime call, Appellant stated, "And like I know that if you tell them that like I sexually assaulted you or that I physically assaulted you, I'm definitely probably going to end up going to jail, so prison."

## II. DISCUSSION

### A. Legal and Factual Sufficiency

On appeal, Appellant asks this court to consider whether his "substantial rights were prejudiced where he was convicted of two specifications of sexual assault alleging overlapping date ranges and otherwise identical language." Appellant contends his convictions for sexual assault are ambiguous and that "the panel was never orientated as to which allegation corresponded to which specification." Additionally, Appellant argues the ambiguity prevents this court from conducting its factual sufficiency review. After considering Appellant's contentions, we find his convictions to both specifications legally and factually sufficient and that no relief is warranted.

#### 1. Law

Issues of legal and factual sufficiency are reviewed de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States*

*v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). "The term reasonable doubt, however, does not mean that the evidence must be free from conflict." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (citing *United States v. Lips*, 22 M.J. 679, 684 (A.F.C.M.R. 1986)), *aff'd*, 77 M.J. 289 (C.A.A.F. 2018). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King*, 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted). The test for legal sufficiency "gives full play to the responsibility of the trier of fact fairly to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." *Unites States v. Oliver*, 70 M.J. 64, 68 (C.A.A.F. 2011) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319 (1973)).

"The test for factual sufficiency 'is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses,' [this] court is 'convinced of the [appellant]'s guilt beyond a reasonable doubt.'" *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000) (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt.'" *Wheeler*, 76 M.J. at 568 (alteration in original) (quoting *Washington*, 57 M.J. at 399). The term "reasonable doubt" does not mean evidence free from conflict. *See Lips*, 22 M.J. at 684. This court's review of the factual sufficiency of evidence for findings is limited to the evidence admitted at trial. *See* Article 66(d), UCMJ, 10 U.S.C. § 866(d); *United States v. Beatty*, 64 M.J. 456, 458 (C.A.A.F. 2007) (citations omitted).

"[T]he finder of fact at the trial level is always in the best position to determine the credibility of a witness." *United States v. Peterson*, 48 M.J. 81, 83 (C.A.A.F. 1998).

Appellant was convicted of sexual assault, in violation of Article 120, UCMJ, which required the Government to prove beyond a reasonable doubt the following two elements: (1) Appellant committed a sexual act upon another person; and (2) Appellant did so without the consent of the other person. *See Manual for Courts-Martial, United States* (2019 ed.), pt. IV, ¶ 60.b.(2)(d).

The two specifications that Appellant was charged with read as follows:

> Specification 1: In that [Appellant] . . . did, at or near Barksdale
> Air Force Base, Louisiana, between on or about *1 June 2020 and*

*on or about 30 June 2020*, commit a sexual act upon [CT], by penetrating her vulva with his penis, without her consent.

Specification 2: In that [Appellant] . . . did, at or near Barksdale Air Force Base, Louisiana, between on or about *8 June 2020 and on or about 31 July 2020*, commit a sexual act upon [CT], by penetrating her vulva with his penis, without her consent.

(Emphasis added).

An "ambiguous verdict" is one which prevents the reviewing court from conducting their Article 66, UCMJ, review. *United States v. Walters*, 58 M.J. 391, 397 (C.A.A.F. 2003). "[T]he remedy for a *Walters* violation is to set aside the finding of guilty to the affected specification and dismiss it with prejudice." *United States v. Scheurer*, 62 M.J. 100, 112 (C.A.A.F. 2005) (footnote omitted).

"With minor exceptions for capital cases, a 'court-martial panel, like a civilian jury, returns a general verdict and does not specify how the law applies to the facts, nor does the panel otherwise explain the reasons for its decision to convict or acquit.'" *United States v. Brown,* 65 M.J. 356, 359 (C.A.A.F. 2007) (quoting *United States v. Hardy*, 46 M.J. 67, 73 (C.A.A.F. 1997)).

**2. Analysis**

The Government introduced sufficient evidence of Appellant's guilt during the court-martial. The weight of the evidence came directly from the victim, CT, who described in sufficient detail two different sexual assaults which occurred in the summer of 2020. During CT's testimony, she recounted how Appellant penetrated her vulva without her consent. She testified both assaults took place in her dormitory room at Barksdale AFB. She was also clear the first time she was sexually assaulted by Appellant was in June of 2020 and the second sexual assault occurred approximately two weeks later. She confirmed both sexual assaults occurred before the Fourth of July 2020 weekend. She did not consent to the sexual acts and communicated her lack of consent to Appellant through her words and actions. We find CT's testimony alone is sufficient to support Appellant's convictions for the charged offenses. As an evidentiary standard, proof beyond a reasonable doubt does not require more than one witness to testify credibly. *See United States v. Rodriguez-Rivera,* 63 M.J. 372, 383 (C.A.A.F. 2006) (explaining the testimony of a single witness may satisfy the Government's burden to prove every element of a charged offense beyond a reasonable doubt). We also find CT's testimony is supported by the text messages Appellant sent to CT concerning the sexual assaults, as well as the statements made by Appellant during the third pretext video call. Finally, we are cognizant that "the finder of fact at the trial level is always in the best position to determine the credibility of a witness." *Peterson*, 48 M.J. at 83.

Appellant's primary contention on appeal is the verdict in his case is ambiguous, which he argues makes it impossible for this court to complete its factual sufficiency review. Citing *Walters*, Appellant contends that because CT's allegations could fall within the language of either charged specification, we cannot be sure which facts support which offense. We do not share Appellant's confusion. *Walters* only applies in those "narrow circumstance[s] involving the conversion of a 'divers occasions' specification to a 'one occasion' specification through exceptions and substitutions." 58 M.J. at 396. It is clear the narrow holding in *Walters* does not apply to this case, since neither specification was charged on divers occasions.

Moreover, we find the specifications indicate two distinct sexual assaults, and that one assault happened before the other. We also find the evidence itself clearly provides this court with an adequate indication, beyond a reasonable doubt, as to what conduct formed the basis for each specification, and in no way inhibits our ability to conduct a factual sufficiency review. As we stated above, CT's testimony clearly supports two distinct sexual assaults. The first assault occurred in June, with the second occurring approximately two weeks later.

Viewing the evidence in the light most favorable to the Prosecution, we conclude a rational trier of fact could have found the essential elements of the offenses beyond a reasonable doubt. *See Robinson*, 77 M.J. at 297–98. Furthermore, after weighing all the evidence in the record of trial and making allowances for not having personally observed the witnesses, we are ourselves convinced of Appellant's guilt beyond a reasonable doubt. *See Reed*, 54 M.J. at 41 (citation omitted).

## B. Uncharged Misconduct

Appellant argues the military judge abused her discretion by allowing the Government to present evidence of Appellant's "prior bad acts." Appellant highlights the following testimony from CT which he contends was inadmissible character evidence: Appellant (1) was married while he was dating her; (2) was dishonest with her regarding the status of his separation and divorce; (3) cheated on CT and lied to her about cheating on her; (4) used threats of suicide as a manipulation tactic; (5) had a violent temper; (6) made a racist and derogatory remark to her; and (7) used fake phone numbers to call her. Additionally, Appellant complains it was improper that CT was allowed to discuss how she felt about Appellant's apology, and it was improper that SA RF was allowed to testify about CT's emotional state following the pretext phone calls. Finally, Appellant complains SA RF improperly presented "human lie detector testimony" when he discussed the goals of the pretext phone calls. We find that the military judge did not abuse her discretion in permitting the above testimony, and, therefore, no relief is warranted.

### 1. Additional Background

All of the statements that Appellant contends are uncharged misconduct were elicited during the testimony of CT and SA RF.

#### a. CT's Testimony

During CT's testimony, she described when she first met Appellant: "My initial impression of [Appellant] -- he kind of made some like derogatory jokes regarding my appearance and ethnicity and intelligence, and so we didn't really -- I didn't really interact very much with him." She eventually changed her mind about him and described the progression of their relationship as "a friendship initially," as Appellant "was going through a separation with his wife at the time, so [she] offered advice and support like in any way that [she] could. And then [she] just -- eventually, as he was going through the separation, developed romantic feelings" for him. The following sequence between trial counsel and CT expanded on Appellant's marital status:

> Q: At the time that you developed romantic feelings, did you understand what the status was of his marriage?
>
> A: He told me that he was going through a divorce.
>
> Q: Did you know whether papers had been filed or anything like that?
>
> A: At that time, not to my knowledge.
>
> Q: Can you tell the panel a little bit about how serious your relationship got during technical school?
>
> A: Like examples of like what -- like our relationship status or --
>
> Q: Uh-huh.
>
> A: So we had started dating at [Appellant]'s insistence. He was very forward with me. He would say a lot of the times that he knew what he wanted when he saw it, and so I felt maybe flattered. And I felt as if he seemed to show a desire to want to, like, improve as a person. And so when we had started our romantic relationship, we had often went out to eat, and we had just done like a lot of activities that tech schoolers do together. And eventually we had gotten engaged very early on, so . . .
>
> Q: Who proposed?
>
> A: [Appellant].
>
> Q: What was your response?

A: It was yes. It was kind of in an informal setting. He proposed to me in his dorm room bathroom.

Q: Was there a ring?

A: Yes.

Q: Did you ever during tech school discover that the relationship with his wife wasn't what it seemed?

A: Yes.

Q: How so?

A: She would call him and text him very often crying. And he would, like, walk off into the bathroom and speak to her. And I would overhear their conversation sometimes, where she would ask why he was doing this to her.

Q: Did it seem to you at times like they were divorcing?

A: No.

[Trial Defense Counsel]: Objection. Speculation.

[Military Judge]: Sustained. Ask a different question, [t]rial [c]ounsel. Members, please disregard the question and the answer.

Q: Was his relationship with his then-wife a source of stress or a source of conflict for you even in technical school?

A: Yes.

Q: Despite that, did the two of you make plans to see each other after tech school?

A: Yes.

Q: Did the engagement continue past technical school?

A: It did.

(Omission in original).

CT then described to trial counsel the change of circumstances in her relationship with Appellant:

Q: Into 2019, you continued to see [Appellant] as your then-fiancé?

A: Yes, until the summer of that year.

Q: Until the summer. And what happened in the summer?

A: In the summer of that year I discovered that [Appellant] was lying to me and he was pursuing a relationship with someone else.

Q: I want to talk about that for a minute. How did you discover that he was pursuing a relationship with someone else?

A: He eventually ended up telling me.

CT described that during their relationship, she and Appellant shared their locations with each other using an application on their phones. She stated they did this because Appellant "wanted security" and wanted to know "what [she] was doing." She later described that Appellant would frequently check her location and would "blow up [her] phone a lot saying that [she] should be home and that [she] shouldn't be like hanging out with anybody."

Although their relationship ended in the summer of 2019, CT explained how Appellant pursued getting back together with her. She had blocked Appellant from being able to contact her following their break-up, but Appellant used a "phone-texting" application to contact her. During one phone call in December 2019, Appellant threatened to harm himself if they did not get back together. She testified, "I eventually picked up one of his phone calls. And from what I believe and what he had told me, he was already starting that five-hour drive to Barksdale [AFB], and he was threatening to kill himself if we didn't reenter a relationship." CT began a romantic relationship with another person in the fall of 2019 which lasted until "the end of spring 2020 into the summer of 2020." She did not see Appellant in person until the summer of 2020, following the end of her relationship with the other person.

Later in her testimony CT described Appellant's temper:

Q: Was there conflict at all during this chapter of you all's relationship in the spring/summer of [2020]?

A: Yes. It angered [Appellant] that I had pursued a different relationship with [another Air Force member]. It was something that frustrated him very often why I could possibly be with somebody else.

Q: Can you describe what that anger looked like?

A: It was pretty explosive. Like he would have angry outbursts and yell, like hit things. He would occasionally like -- he was just a very physical person.

Q: Was there ever an occasion where he put his hands on you?

A: Yes.

CT then described events related to a physical assault that Appellant was charged with—Specification 2 of Charge II—of which Appellant was ultimately acquitted.

CT also described a text exchange where she asked Appellant to apologize for sexually assaulting her. After reading Appellant's response, she was asked by trial counsel if the "apology sufficiently addressed what [Appellant] had actually done to [her]," and she answered, "No."

### b. SA RF's Testimony

At trial, SA RF discussed goals of the pretext phone calls between CT and Appellant. He stated:

> The goal of the recorded conversations, which occurred over a series of approximately 48 hours from 20 April 2021 to 22 April 2021, was to elicit information from [Appellant] in an environment and atmosphere that he was more likely to provide truthful statements and not withhold information that he would have otherwise withheld from [AFOSI] had we had the opportunity to interview him in person.

SA RF went on to describe the objective and usefulness of pretext communications:

> We were hoping to introduce the topic of the various nights or days that these alleged offenses occurred. And then based on training and experience, typically if we can get an individual talking and recounting those events, if they did, in fact, do what the party is alleging that they did, in some cases they might apologize about the incident, and that's essentially what we were hoping to get is an apology.

During the end of SA RF's testimony, he was asked to describe CT's emotional state following the last pretext phone call. The following exchange occurred between the trial counsel and SA RF:

> Q: And did you or the other agents make any attempts to console [CT] after that had concluded?
>
> A: Yes, sir. [SA TC] hugged [CT].
>
> Q: Is [SA TC] a male or female?
>
> A: Female.
>
> Q: All right. And is there a reason she did that?
>
> A: They knew each other prior to [SA TC] joining [AF]OSI.

Q: I see. Was [CT], was she emotional as a result of that interaction?

A: Yes, sir.

**2. Law**

"The standard of review for a military judge's decision to admit evidence is abuse of discretion." *United States v. Fetrow*, 76 M.J. 181, 185 (C.A.A.F. 2017) (citing *United States v. Yammine*, 69 M.J. 70, 73 (C.A.A.F. 2010)). "A military judge abuses his discretion when: (1) the findings of fact upon which he predicates his ruling are not supported by the evidence of record; (2) if incorrect legal principles were used; or (3) if his application of the correct legal principles to the facts is clearly unreasonable." *United States v. Ellis*, 68 M.J. 341, 344 (C.A.A.F. 2010) (citation omitted).

Whether an accused has waived or instead forfeited an issue is a question of law this court reviews de novo. *United States v. Ahern*, 76 M.J. 194, 197 (C.A.A.F. 2017) (citation omitted). In the absence of waiver, a plain error standard of review applies to situations where a counsel fails to object or where an objection failed to preserve discrete issues. *See United States v. Tyler,* 81 M.J. 108, 113 (C.A.A.F. 2021) (explaining an accused has a duty to state the specific ground for objection in order to preserve a claim of error on appeal). Under the plain error standard, an appellant must show "(1) there was an error; (2) it was plain or obvious; and (3) the error materially prejudiced a substantial right." *United States v. Erickson*, 65 M.J. 221, 223 (C.A.A.F. 2007). "[W]here a forfeited constitutional error was clear or obvious, 'material prejudice' is assessed using the 'harmless beyond a reasonable doubt' standard . . . ." *United States v. Tovarchavez*, 78 M.J. 458, 460 (C.A.A.F. 2019) (citing *Chapman v. California*, 386 U.S. 18 (1967)) (additional citation omitted). "That standard is met where a court is confident that there was no reasonable possibility that the error might have contributed to the conviction." *Id.* (citing *Chapman*, 386 U.S. at 24). "[T]he Government must prove that the [nonstructural constitutional] error was harmless beyond a reasonable doubt even on plain error review." *United States v. Palacios Cueto*, 82 M.J. 323, 334 (C.A.A.F. 2002) (citing *Tovarchavez*, 78 M.J. at 460).

Evidence is relevant if it has any tendency to make a fact of consequence more or less probable. Mil. R. Evid. 401. Relevant evidence is generally admissible absent a rule requiring otherwise. Mil. R. Evid. 402. Even when evidence is relevant, a military judge may prohibit its admission when the evidence's probative value is substantially outweighed by such considerations as unfair prejudice, confusion of the issues, or waste of time. Mil. R. Evid. 403.

Mil. R. Evid. 404(b) provides that evidence of a crime, wrong, or other act by a person is generally not admissible as evidence of the person's character in

order to show the person acted in conformity with that character on a particular occasion. However, such evidence may be admissible for another purpose, including, *inter alia*, proving motive, intent, or absence of mistake. Mil. R. Evid. 404(b)(2). The list of potential purposes in Mil. R. Evid. 404(b)(2) "is illustrative, not exhaustive." *United States v. Ferguson,* 28 M.J. 104, 108 (C.M.A. 1989).

We apply a three-part test to review the admissibility of evidence under Mil. R. Evid. 404(b): (1) does the evidence "reasonably support a finding" that the accused committed the prior crime, wrong, or act; (2) what "fact of . . . consequence is made more or less probable" by the proffered evidence; and (3) is the "probative value . . . substantially outweighed by the danger of unfair prejudice?" *United States v. Reynolds*, 29 M.J. 105, 109 (C.M.A. 1989) (internal quotation marks and citations omitted). Upon defense request, the Government must "provide reasonable notice of the general nature of any such evidence" it intends to offer, either before trial or—if the military judge excuses the lack of pretrial notice for good cause—during trial. Mil. R. Evid. 404(b)(2).

**3. Analysis**

Since trial defense counsel failed to object to the above-referenced testimony, we review the admissibility of the testimony for plain error. We conclude that Appellant has failed to establish any error, let alone plain or obvious error.

First, we discuss the evidence concerning Appellant's behavior during his relationship with CT; specifically, the testimony concerning his deceptive actions and statements, sudden outbursts of anger, previous violence toward CT, and attempts to control CT. Appellant argues that this evidence was inadmissible character evidence. We disagree. Mil. R. of Evid 404(b) is "a rule of inclusion, not exclusion." *United States v. Humphreys*, 57 M.J. 83, 90 (C.A.A.F. 2002). Here, we find that the testimony meets all three prongs of the *Reynolds* test. First, the evidence reasonably supports the finding by the factfinder that Appellant engaged in the behavior described by the testimony. Here, the Government offered evidence—in the form of CT's testimony—that the acts actually occurred. Second, the behavior displayed by Appellant are facts and circumstances that explain Appellant's on-again, off-again relationship with CT, which speaks directly to the facts of consequence in this case involving consent, lack of mistake as to consent, control, and violence. Additionally, we find the evidence at issue was permissible to show Appellant's motive, intent, and plan to dominate and control CT. *See United States v. Moore,* 78 M.J. 868, 874 (A.F. Ct. Crim. App. 2019) (finding a military member's controlling behavior was admissible to prove two sexual assault offenses charged under Articles 120 and 128, UCMJ). As in *Moore,* the testimony here was also probative and necessary for the Government to overcome any presumption that a boyfriend would not physically or sexually harm his girlfriend. Third, we find the probative value

of the evidence to be high and the risk of unfair prejudice to be low. We conclude that Appellant has not demonstrated any error, let alone plain or obvious error, in the military judge allowing this evidence.

Next Appellant argues it was improper that CT was allowed to discuss how she felt about Appellant's apology and that SA RF was allowed to discuss CT's emotional state following the third pretext phone call. Appellant argues this testimony was improper "victim impact" evidence. Again, trial defense counsel did not object so we review the admission of this testimony for plain error. Appellant's argument is misplaced. This evidence was not offered as victim impact evidence; it was offered during the Government's case-in-chief to show CT had a past negative interaction with Appellant, did not accept his apology, and that it was emotionally difficult for her to speak with him. We find this testimony relevant on the issue of whether CT consented to the sexual activity. Therefore, we do not find Appellant has demonstrated plain or obvious error. However, even if we were to find plain or obvious error here, Appellant cannot demonstrate prejudice, as the members would have been able to see CT's emotional state following the pretext calls on the video admitted at trial and would have been able to glean her tone after reading her terse responses to Appellant's text messages.

Next, Appellant argues that SA RF improperly commented on Appellant's Fifth Amendment[4] right against self-incrimination. Appellant highlights a portion of SA RF's testimony where he discussed the goal of the pretext phone calls between CT and Appellant. There was no objection raised concerning this testimony, so we again review for plain error. In the testimony at issue, SA RF stated that the goal of the pretext communications was "to elicit information from [Appellant] in an environment and atmosphere that he was more likely to provide truthful statements and not withhold information that he would have otherwise withheld from us *had* [*AFOSI*] *had the opportunity to interview him in person.*" (Emphasis added). We do not find the highlighted statement to be commenting on Appellant's Fifth Amendment rights. We read this statement as expressing that AFOSI did not interview Appellant. This conclusion was further supported by SA RF's testimony, where he indicated that he chose to pursue a pretext call instead of interviewing Appellant. Therefore, we find no plain error.

Lastly, Appellant argues that SA RF provided improper "human lie detector" testimony. Appellant specifically highlights the following testimony: "[I]f we can get an individual talking and recounting those events, if they did, in fact, do what the party is alleging that they did, in some cases they might apologize about the incident, and that's essentially what we were hoping to get is

---

[4] U.S. CONST. amend. V.

an apology." There was no objection to this testimony, so we again review for plain error. Human lie detector testimony is "an opinion as to whether a person was truthful in making a specific statement regarding a fact at issue in the case." *United States v. Kasper,* 58 M.J. 314, 315 (C.A.A.F. 2003) (citations omitted). In our review of the record, including the above statement, we find no evidence SA RF indicated that he had the ability to determine whether Appellant was being deceptive or honest. Specifically looking at the statement above, SA RF testified, "[*I*]*f* they did, in fact, do what the party is alleging that they did, in some cases they *might* apologize." (Emphasis added). Therefore, we conclude SA RF's statement did not amount to impermissible human lie detector testimony, and Appellant has not established plain error.

## C. Trial Counsel's Findings Argument

Appellant also argues that several comments trial counsel made during his findings and rebuttal arguments constituted improper remarks and prosecutorial misconduct. Specifically, Appellant contends trial counsel improperly (1) vouched for the credibility of witnesses and Appellant's guilt; (2) personalized his argument; and (3) addressed trial defense counsel. We find no error occurred and no relief is warranted.

### 1. Additional Background

Appellant argues trial counsel repeatedly engaged in improper vouching by using the phrase "three credible witnesses" at multiple points during his findings argument. However, the record establishes that trial counsel also repeatedly reminded the panel members to "consider the judge's instructions on credibility, and [ ] apply [that] criteria."

Appellant also argues trial counsel improperly personalized his argument, and emphasized trial counsel's argument as follows: "If somebody accuses *you* of rape, under what circumstances, on what planet are *you* just going to ignore that, are *you* not going to correct the record."

Finally, Appellant contends trial counsel improperly addressed trial defense counsel when he argued, "But you're right, [d]efense [c]ounsel, it wasn't a violent struggle" while addressing the level of resistance displayed by CT.

Trial defense counsel did not object to any of the above-referenced arguments. Following argument by both counsel, the military judge gave the following curative instruction to the panel:

> Members of the court, if you believe you heard either counsel express their personal opinion about a witness's character or the strength of the evidence, you may not consider it for that purpose. Counsel are not permitted to offer their personal opinions. This was merely argument. Neither counsel's personal opinions,

qualifications, or personal conduct in court are matters relevant for your consideration in resolving the matters before you. You and you alone determine the credibility of witnesses and whether the Government has proven the element of any offense beyond a reasonable doubt.

I'll remind you that argument by counsel is not evidence. Counsel are not witnesses. If the facts as you remember them differ from the way counsel stated the facts, it is your memory of the facts that controls.

And finally to the extent counsel have referred to my instructions, if there is any inconsistency between what counsel have said and the instructions I gave you, you must accept my statement as being true.

### 2. Law

"We review prosecutorial misconduct and improper argument de novo and where . . . no objection is made, we review for plain error." *United States v. Voorhees*, 79 M.J. 5, 9 (C.A.A.F. 2019) (citing *United States v. Andrews*, 77 M.J. 393, 398 (C.A.A.F. 2018)).

"Plain error occurs when (1) there is error, (2) the error is plain or obvious, and (3) the error results in material prejudice to a substantial right of the accused." *United States v. Fletcher*, 62 M.J. 175, 179 (C.A.A.F. 2005) (citation omitted). Generally, the burden of persuasion under a plain error review is on the appellant. *See United States v. Bungert*, 62 M.J. 346, 348 (C.A.A.F. 2006) (citation omitted).

Prosecutorial misconduct occurs when trial counsel "oversteps the bounds of that propriety and fairness which should characterize the conduct of such an officer in the prosecution of a criminal offense." *Fletcher*, 62 M.J. at 178 (quoting *Berger v. United States*, 295 U.S. 78, 84 (1935)). Such conduct "can be generally defined as action or inaction by a prosecutor in violation of some legal norm or standard, *e.g.*, a constitutional provision, a statute, a Manual rule, or an applicable professional ethics canon." *United States v. Hornback*, 73 M.J. 155, 160 (C.A.A.F. 2014) (quoting *United States v. Meek*, 44 M.J. 1, 5 (C.A.A.F. 1996)).

"Improper argument" by trial counsel "is one facet of prosecutorial misconduct." *United States v. Sewell*, 76 M.J. 14, 18 (C.A.A.F. 2017) (citation omitted). Counsel must limit arguments to evidence in the record and reasonable inferences that can be drawn from such evidence. *United States v. Baer*, 53 M.J. 235, 237 (C.A.A.F. 2000). By this standard, a prosecutor is permitted to comment on government witnesses' credibility in summation when the accused made prior efforts to impeach those witnesses during the evidentiary phase of

trial. *See United States v. Young*, 470 U.S. 1, 12 (1985). On the other hand, a prosecutor may not "make arguments that 'unduly . . . inflame the passions or prejudices of the court members.'" *United States v. Schroder*, 65 M.J. 49, 58 (C.A.A.F. 2007) (omission in original) (quoting *United States v. Clifton*, 15 M.J. 26, 30 (C.M.A. 1983)) (additional citation omitted). Trial counsel is also prohibited from discussing facts not in evidence or personal opinions about the truth or falsity of testimony or evidence. *See id.*; *Fletcher*, 62 M.J. at 179; Rule for Courts-Martial 919(b), Discussion.

"[A]rgument by a trial counsel must be viewed within the context of the entire court-martial. The focus of [the] inquiry should not be on words in isolation." *Baer*, 53 M.J. at 238 (citations omitted). "[I]t is improper to 'surgically carve' out a portion of the argument with no regard to its context." *Id.* In judging the propriety of a prosecutor's remarks, "the lack of a defense objection is 'some measure of the minimal impact of a prosecutor's improper comment.'" *United States v. Gilley*, 56 M.J. 113, 123 (C.A.A.F. 2001) (quoting *United States v. Carpenter*, 51 M.J. 393, 397 (C.A.A.F. 1999)).

"When a trial counsel makes an improper argument during findings, 'reversal is warranted only when the trial counsel's comments taken as a whole were so damaging that we cannot be confident that the members convicted the appellant on the basis of the evidence alone.'" *United States v. Norwood*, 81 M.J. 12, 19 (C.A.A.F. 2021) (quoting *Andrews*, 77 M.J. at 401–02), *cert. denied*, 141 S. Ct. 2864 (2021). "We weigh three factors to determine whether trial counsel's improper arguments were prejudicial: '(1) the severity of the misconduct, (2) the measures adopted to cure the misconduct, and (3) the weight of the evidence supporting the conviction.'" *Andrews*, 77 M.J. at 402 (quoting *Fletcher*, 62 M.J. at 184).

### 3. Analysis

Since trial defense counsel did not object, we review trial counsel's findings and rebuttal arguments for plain error. Even if we were to assume plain error, Appellant has failed to demonstrate that the alleged misconduct was "so damaging" as to call into question whether the panel members convicted Appellant on the basis of the evidence alone. *See Norwood*, 81 M.J. at 19. "In assessing prejudice, we look at the cumulative impact of any prosecutorial misconduct on the accused's substantial rights and the fairness and integrity of his trial." *Voorhees*, 79 M.J. at 12 (quoting *Fletcher*, 62 M.J. at 184).

Applying the first *Fletcher* factor, we find that the alleged misconduct taken together was not severe and amounted to a few isolated words in an otherwise lengthy argument. We find that trial defense counsel's failure to object to any of the argument highlighted above is "some measure of the minimal impact of [the] prosecutor's improper argument." *Gilley*, 56 M.J. at 113.

As to the second factor, the record establishes that the military judge provided curative instructions following both parties' findings arguments. One of the instructions specifically addressed the possibility that both trial counsel and trial defense counsel had expressed their personal opinions regarding the character of the witnesses or the strength of the evidence, and reminded members that they alone determine the credibility of witnesses and whether the Government has proven the element of any offense beyond a reasonable doubt. The curative instruction also reminded the panel members that argument by counsel was not evidence, and that they were to follow the military judge's instructions in reaching a verdict.

Finally, as to the third factor, we find the weight of the evidence supporting the convictions was strong, including compelling testimony from CT and inculpatory statements made by Appellant during the pretext conversation and text messages. In conclusion, we are confident Appellant was properly convicted on the basis of the evidence alone. *See Fletcher,* 62 M.J. at 184.

### D. Ineffective Assistance of Counsel

Appellant argues he was denied effective assistance of counsel under the Sixth Amendment[5] due to alleged deficiencies in the performance of his trial defense counsel. Specifically, Appellant highlights two areas where his trial defense counsel were deficient. First, he argues his trial defense counsel perfected an otherwise missing element from the offenses during the cross-examination of CT by confirming that her testimony was Appellant "penetrated her vulva with his penis." Appellant claims there was no evidence of penetration before the court prior to trial defense counsel's questions. Second, Appellant argues trial defense counsel failed to object to "voluminous improper evidence and argument." The evidence and argument highlighted here by Appellant is the same as we discussed *supra.* We find Appellant has failed to establish that his trial defense were deficient, and therefore conclude no relief is warranted.

#### 1. Additional Background

On 8 January 2024, we ordered both of Appellant's trial defense counsel, Major (Maj) AM and Maj NA, to provide responsive declarations to address Appellant's ineffective assistance of counsel claims. On 14 February 2024, the court attached those declarations to the record of trial.[6]

---

[5] U.S. CONST. amend. VI.

[6] Because the issue was raised in the record but was not fully resolvable by those materials, we may consider the declarations submitted by the parties consistent with *United States v. Jessie*, 79 M.J. 437, 444 (C.A.A.F. 2020).

We have considered whether a post-trial evidentiary hearing is required to resolve any factual disputes between Appellant's assertions and his trial defense counsel's assertions. *See* Article 66(f)(3), UCMJ, 10 U.S.C. § 866(f)(3); *United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997); *United States v. DuBay,* 37 C.M.R. 411, 413 (C.M.A. 1967) (per curiam). We find a hearing unnecessary to resolve Appellant's claims.

In his declaration, Maj AM provided this court with the following background to add context to the decisions they made during their representation of Appellant. Appellant was initially charged with offenses against three different women, none of whom knew each other, as well as animal abuse. Maj AM explained that law enforcement initially became involved in the case after responding to a domestic disturbance between Appellant and his wife, at which point law enforcement officials began speaking to women from Appellant's past in an attempt to establish a pattern of behavior. By the time Maj AM and Maj NA got involved with the case, Appellant had made a number of statements to CT, including: "I had sex with you when you didn't want to;" "I wanted to be in control;" "I'm sorry—I don't know what you want me to do about it, though;" and "What's done is done."

Maj AM also highlighted in his declaration the following testimony from trial counsel's direct examination with CT:[7]

> Q: Did you fight him off or push him or in any way struggle?
>
> A: When he -- when he -- when he was penetrating me, yeah, I kind of tried to push him off.
>
> Q: You said that you struggled when he penetrated you; is that correct?
>
> A: Yes.
>
> Q: When did he actually penetrate you? How soon after putting the condom on?
>
> A: It was pretty fast.
>
> Q: Did he ask you for permission if he could penetrate you?
>
> A: No.
>
> Q: Before he penetrated you, had you continued to protest?
>
> A: Yes.

---

[7] The exchange in this paragraph is taken verbatim from the declaration Maj AM provided in response to this court's 8 January 2024 order.

Q: Was it painful?

A: Yes.

Q: Where did it hurt?

A: It hurt where he penetrated me.

Q: Did he kiss you or try to?

A: He tried to.

Q: When?

A: When he was having -- when he was on . . .

Q: Was it after he had put himself inside of you, ma'am?

A: Yeah.

Q: When he got on top of you in the bed in your dorm room and inserted himself into you after you told him no and you weren't ready, did any part of you consent to that?

A: No.

Q: When he did it again two weeks later and he put a pillow over your head as you cried, was that consensual?

A: No.

(Omission in original) (citations omitted).

On cross-examination Maj AM asked CT the following questions:

Q: Okay. Understood. So whether the condom is on or not, at this point in time is when he penetrates your vagina with his penis?

A: Yes.

. . . .

Q: Okay. So both instances you don't recall if he wore the condom?

A: I don't recall if he wore the condom, but I do know that he had the condoms in his wallet.

Q: All right. So regardless if he puts it on or he just opened it to open it, he then proceeds to penetrate your vagina with his penis?

A: Yes.

Maj AM also explained that the Defense considered a number of different options for presenting the best defense for Appellant. He described in some

detail that the most promising trial defense strategy for an acquittal was not to argue that Appellant and CT never had sex. Rather they believed a better path would be to use the evidence to imply that if Appellant and CT did have sex, CT regretted it because of her conflicted feelings with regard to her relationship with another person. They chose that strategy because it permitted the Defense to argue that CT had a bias and motive to fabricate, which in turn caused her to transform a consensual sexual encounter into a sexual assault. Additionally, Maj AM explained the Defense made a conscious decision to leverage the evidence of uncharged misconduct to show that the charges did not stem from independent, unrelated reports but instead arose from investigative overreach by the law enforcement that produced false reports—that Appellant had sexually assaulted CT on two occasions—long after the offenses occurred.

**2. Law**

The Sixth Amendment guarantees an accused the right to effective assistance of counsel. *Gilley*, 56 M.J. at 124. In assessing the effectiveness of counsel, we apply the standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and begin with the presumption of competence announced in *United States v. Cronic*, 466 U.S. 648, 658 (1984). *See Gilley*, 56 M.J. at 124 (citing *United States v. Grigoruk*, 52 M.J. 312, 315 (C.A.A.F. 2000)). We review allegations of ineffective assistance de novo. *United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (citing *United States v. Mazza*, 67 M.J. 470, 474 (C.A.A.F. 2009)).

We utilize the following three-part test to determine whether the presumption of competence has been overcome:

> 1. Are the appellant's allegations true; if so, "is there a reasonable explanation for counsel's actions"?
>
> 2. If the allegations are true, did defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers"?
>
> 3. If defense counsel was ineffective, is there "a reasonable probability that, absent the errors," there would have been a different result?

*Id*. (alteration and omission in original) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)). The burden is on an appellant to demonstrate both that counsel's performance was deficient, and the deficiency resulted in prejudice. *United States v. Datavs*, 71 M.J. 420, 424 (C.A.A.F. 2012) (citation omitted). An appellant overcomes the presumption of competence only when he shows there were "errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687.

"Defense counsel do not perform deficiently when they make a strategic decision to accept a risk or forego a potential benefit, where it is objectively reasonable to do so." *Datavs*, 71 M.J. at 424 (citations omitted). In reviewing the decisions and actions of trial defense counsel, this court ordinarily does not second-guess strategic or tactical decisions. *See United States v. Morgan*, 37 M.J. 407, 410 (C.M.A. 1993) (citations omitted). It is only in those limited circumstances where a purported "strategic" or "deliberate" decision is unreasonable or based on inadequate investigation that it can provide the foundation for a finding of ineffective assistance. *See United States v. Davis*, 60 M.J. 469, 474 (C.A.A.F. 2005).

"When a claim of ineffective assistance of counsel is premised on counsel's failure to make a motion . . . , an appellant must show that there is a reasonable probability that such a motion would have been meritorious." *United States v. Beauge*, 82 M.J. 157, 167 (C.A.A.F. 2022) (omission in original) (citation omitted).

This court does "not measure deficiency based on the success of a trial defense counsel's strategy, but instead examine[s] 'whether counsel made an objectively reasonable choice in strategy' from the available alternatives." *United States v. Akbar*, 74 M.J. 364, 379 (C.A.A.F. 2015) (quoting *United States v. Dewrell*, 55 M.J. 131, 136 (C.A.A.F. 2001)). For this reason, defense counsel receive wide latitude in making tactical decisions. *Cullen v. Pinholster*, 563 U.S. 170, 195 (2011) (citing *Strickland*, 466 U.S. at 689). This also applies to trial defense counsel's strategic decisions. *Morgan*, 37 M.J. at 410. "[S]trategic choices made by trial defense counsel are virtually unchallengeable after thorough investigation of the law and the facts relevant to the plausible options." *Akbar*, 74 M.J. at 371 (internal quotation marks and citation omitted).

In making this determination, courts must be "highly deferential" to trial defense counsel and make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. Moreover, "[t]he likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 562 U.S. 86, 112 (2011) (citation omitted).

In adjudicating ineffective assistance of counsel claims, "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, . . . that course should be followed." *Datavs*, 71 M.J. at 424–25 (first alteration in original) (quoting *Strickland,* 466 U.S. at 697).

### 3. Analysis

We address Appellant's contentions in the order presented. Appellant's first contention is that his counsel perfected an otherwise missing element

from an offense during the cross-examination of CT by confirming her testimony was Appellant "penetrated her vulva with his penis." We find ample evidence in the record CT had already testified—multiple times—that Appellant penetrated her without her consent on two occasions in the summer of 2020. Contrary to Appellant's contentions on appeal, the record is also sufficiently clear CT was describing the penetration of her vulva by Appellant's penis. As the record does not support Appellant's contentions, we find Appellant has failed to establish that his counsel performed deficiently.

As to Appellant's second claim that his counsel failed to object to certain testimony and argument, we also find Appellant has failed to establish deficient performance. In their declarations to this court, both trial defense counsel stated they considered a number of different possibilities on how to present the best defense. Ultimately, they decided it was better not to question whether the sexual acts occurred, but to challenge the element of consent. They described in detail how this strategy allowed them to argue CT had a bias and motive to fabricate, which, in turn, caused her to transform a consensual sexual encounter into a sexual assault. Both trial defense counsel indicated they allowed the Government to adduce certain testimony which might have been objectionable under Mil. R. Evid. 404(b) because it allowed them to "strengthen several key elements of their theory—most notably [CT]'s independent motives to fabricate." Both trial defense counsel also included specific examples of the points they made with each witness called to testify and explained how those examples supported their overall case strategy.

We find Appellant has not demonstrated deficient performance. In fact, we find the record supports that both his trial defense counsel chose a reasonable strategy from available alternatives given the evidence, including the pretrial statements made by Appellant. We also note trial defense counsel's strategy ultimately resulted in Appellant being acquitted of one specification of sexual assault and one specification of assault. We will not second-guess reasonable strategic decisions. *See Morgan*, 37 M.J. at 410. Therefore, Appellant has not met his burden to show deficient performance for failing to object to either the testimony or argument.

### III. CONCLUSION

The findings and sentence as entered are correct in law and fact, and no error materially prejudicial to Appellant's substantial rights occurred. Article 59(a) and 66(d), UCMJ, 10 U.S.C. §§ 859(a), 866(d).[8] Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

FLEMING E. KEEFE, Capt, USAF
Acting Clerk of the Court

---

[8] Although not raised by Appellant, we note that the entry of judgment (EoJ) does not comply with the requirements of R.C.M. 1111(b)(3)(A)(B) concerning Appellant's request for deferment and waiver of the automatic forfeitures. Specifically, the EoJ omits the nature of requests, the convening authority's action on the requests, and the effective dates and length of any relief granted by the convening authority. Appellant has not claimed prejudice as a result of this error, and we find none. We direct the Chief Trial Judge, Air Force Trial Judiciary, to have a detailed military judge correct the EoJ accordingly and prior to completion of the final order under R.C.M. 1209(b).